Timothy C. Rote, *Pro Se*
24790 SW Big Fir Rd.
West Linn 97062
Oregon, USA
tel: (503) 702-7225
fax:

FILED 18 MAR '16 09:49 USDC-ORP

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |
|---|---|
| | **3'16  CV-0471  K!** |
| Timothy C. Rote, | ) Case No. |
| | ) |
| Plaintiff, | ) **VERIFIED COMPLAINT FOR** |
| v. | ) **DECLARATORY RELIEF &** |
| | ) **DAMAGES RACKETEERING** |
| Silicon Valley Bank, Inc., | ) **CONSPIRACY TO** |
| Chester Te, SVB, | ) **ENGAGE IN A PATTERN OF** |
| LiveVox, Inc., | ) **RACKETEERING ACTIVITY,** |
| Eric Grothe | ) **AIDING & ABETTING &** |
| Golden Gate Capital, | ) **RELATED CLAIMS** |
| Carlos A. Samour, | ) |
| Beiging, Shapiro & Barber, LLP, | ) **JURY DEMANDED:** |
| Duncan Barber, atty., | ) |
| Julie Trent, atty., | ) |
| Adam Michelin, atty., | ) |
| The Receivers, Inc., | ) |
| | ) |
| John Does 1-10 | ) 18 U.S.C. 1961 *et seq.*; |
| | ) 18 U.S.C. 1964 |
| | ) (Civil RICO Remedies) |
| Defendants | ) |
| | ) |
| | ) |
| _____ | ) |

66476

**INTRODUCTION**

1. This is a complex civil action for RICO remedies authorized by the federal statutes at 18 U.S.C. 1961 *et seq.;* for declaratory and injunctive relief; for actual, consequential and exemplary damages and for all other relief which this honorable Federal Court deems just and proper under all circumstances which have occasioned this Initial COMPLAINT. See 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO").

2. The primary cause of this action is a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past ten (10) calendar years.

3. The predicate acts alleged here cluster around criminal extortion, bribery, financial statement fraud, tampering with and retaliation against a qualified Witness, destruction of property, retaliation against whistleblower, obstruction of justice & obstruction of criminal investigations. See 18 U.S.C. §§ 1512 and 1513 respectively.

4. Other RICO predicate acts, although *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.* extortion, bribery and financial statement fraud. See 18 U.S.C. §§ 1341 and 1344, respectively.

5. The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon

Plaintiff, with the intent of destroying the business interests of Plaintiff, sponsoring unrelated litigation against Plaintiff, impairing, obstructing, preventing and discouraging Plaintiff from writing & publishing on this and related behaviors of Investment Bank Partners with Silicon Valley Bank.

**JURISDICTION**

6. This honorable Federal Court has original jurisdiction pursuant to the civil RICO remedies at 18 U.S.C. 1964, and the holdings of the U.S. Supreme Court in Tafflin v. Levitt, 493 U.S. 455 (1990), and the U.S. Court of Appeals for the Ninth Circuit in Lou v. Belzberg, 834 F.2d 730, hn. 4 (9th Cir. 1987).

**PARTIES**

7. Plaintiff Timothy C. Rote ("Rote") is an individual resident of the state of Oregon.

8. Defendant Silicon Valley Bank, Inc. ("SVB") is a for-profit corporation organized under the laws of the state of Delaware.

9. Defendant Livevox, Inc. ("Vox") is a for-profit corporation organized under the laws of the state of California and employer of Saffell.

10. Telformance ("Tel") is a for-profit company of unknown organization form & under the laws of a state unknown, employer of Rieple and believed to be a related Party to LiveVox.

11.   Defendant Chester Te ("Te") is an individual resident of the state of California and Assistant Legal Counsel for SVB.

12.   Defendant Carlos A. Samour ("Samour") is an individual resident of the state of Colorado and Chief Judge of Eighteenth Judicial Court.

13.   Defendant Golden Gate Capital ("Golden") is a for-profit corporation organized under the laws of the state of California, a venture partner of SVB and owner of LiveVox.

14.   Defendant Beiging, Shapiro and Barber, LLP, is a for profit Limited Liability Company organized under the laws of the state of Colorado, representing Silicon Valley Bank.

15.   Defendant Duncan Barber ("Barber") is an individual resident of the state of Colorado, outside legal counsel for SVB in this matter and a partner in Defendant Beiging, Shapiro and Barber, LLP.

16.   Defendant Julie Trent ("Trent") is an individual resident of the state of Hawaii, outside legal counsel on this matter and a partner in Beiging, Shapiro and Barber, LLP.

17.   Defendant Adam Michelin ("Michelin") is an individual resident of the state of California and was the operating CEO just before and during the Receivership. Michelin received compensation of approximately $600,000 from SVB in a six month period.

18.   Defendant Eric Grothe ("Grothe") is an individual resident of the state of Colorado, owns The Receivers and was the appointed Receiver for Silicon Valley Bank's foreclosure of the secured assets owned by Touchstar, Inc.

19.   Defendant The Receivers, Inc. ("Receivers") is a for-profit corporation organized under the laws of the state of Colorado and owned by Grothe and his spouse. Plaintiff asserts that SVB or SVB counsel made an investment in the Receiver prior to the trial and had family members working for the Receiver resulting undie influence on the Receiver & Eric Grothe..

## **Background**

20.   In 2008 a company owned by Plaintiff "Rote" entered into a contract with a now liquidated company called Touchstar, Inc. Said company Touchstar was a customer of and debtor to SVB.

21.   In March 2009 rote discovered that Touchstar was for sale at a price of $15 million, owed SVB approximately $7 million and was in default. Foreclosure of the assets was imminent.

22.   At the same time Touchstar was in default to Rote's company NDT on contract performance issues and was attempting to terminate software licenses key to Rote's companies profitability.

23.   A lawsuit was filed in April 2009 by Rote's company to enforce its contract and force Touchstar to remove licenses set to expire in breach of the contract provisions not permitting Touchstar to install temporary licenses.

24.   Adam Michelin was the interim CEO at that time and used the temporary licenses to attempt to extort money from Rote and NDT. Michelin agreed to remove the expiring licenses permanently and entered into agreement with Rote's company. Michelin breached that agreement as well as the underlying Touchstar agreement when he discovered that Rote was talking to a prospective buyer of Touchstar.

25.   In June 2009 Rote discovered that Michelin was disseminating financial information on Touchstar he should have known to be false and was using that information to garner a sales price for Touchstar of $15,000,000. Michelin had already entered in an agreement with SVB to sell the

assets of Touchstar and for which he was to receive a fee of 5% of the sales price.

26. "SVB" foreclosed on the assets of Touchstar in June 2009 and in conjunction with that foreclosure a Receiver was appointed. Said Receiver was "Grothe" an owner and employee of "Receiver".

27. SVB and Michelin continued to present false financials through the discovery stage of the sale for the assets of Touchstar to Noble Systems, which Rote communicated.

28. After foreclosure Michelin's contract with Touchstar was reaffirmed with the Receiver and SVB assumed the obligation for paying Michelin.

29. After foreclosure but before the sale of the assets Rote discovered that the sale of the assets was to be in two parts, the first for $10,000,000 and second for $2 million.

30. Rote also discovered that SVB had no intention of paying the unsecured creditors by structuring the first sale of the assets into two parts, the first to be cash of $4 million and the second to be stock in the buyer of $6 million, recognizing the $4 million in cash only.

31. SVB sold the first group of assets of Touchstar on August 31, 2009 in a transaction of part cash and part stock in the buyer. Shortly thereafter the second group of assets were sold for approximately $2 million.

32. Prior to selling the assets of Touchstar, there were a number of unsecured creditors and litigants against Touchstar and one such litigant was the company owned by Rote. The unsecured creditors received nothing from the sale of the Touchstar assets.

33. Over the course of the next 5 years the enterprise comprised of the Defendants and their employees systematically sought to destroy Rote's property (including NDT and its affiliated companies) through a series of bribes and intimidation intended to benefit SVB and its enterprise affiliates. Chester "Te" of SVB managed the enterprise,

principally assisted by Duncan "Barber" & Julie "Trent".
Enterprise members also included LiveVox", Eric "Grothe", The
Receivers, Inc. ("Receiver"), Carlos A. "Samour" & "Golden"
Gate Capital.

34.  "Leapfrog", a debtor to SVB and customer of NDT was tasked
     with cancelation of its contracts with Rote's company.
     Leapfrog was at the time those contracts were canceled a new
     customer of SVB with no less than a $10,000,000 loan from SVB.
     The annual contract revenue to Rote's company and its
     affiliates was $2.5 million and the losses Rote sustained as a
     result are separate, material and measureable.

35.  Chase Bank informed NDT that its association with Leapfrog
     and the business channel it's in presented exposure to **money
     laundering** concerns and terminated its relationship with NDT a
     short time thereafter. Leapfrog was a customer of Chase Bank
     up to that time.

36.  Golden Gate Capital is a strategic business partner of SVB
     and had control over LiveVox during the trial.

37.  LiveVox has control over Saffell as an employee and with
     the assistance of TE and Barber directed him to provide false
     testimony during the trial and in affidavits from 2009 through
     the trial date. And Saffell did provide false testimony.

38.  Telformance is believed to be a related party to LiveVox
     but there is insufficient information to name Telformance as a
     Defendant. The form of organization is unknown. Its state of
     organization is unknown. Its investors are unknown but
     believed to be SVB. It is engaged in the same business as
     LiveVox and is believed to have a relationship with LiveVox.
     It maintains a corporate office in Colorado but is not
     registered to do business in Colorado. Chris Rieple worked
     with LiveVox and is now an Executive Vice President with
     Telformance. Chris Rieple gave false testimony during the
     trial that had a material impact on the trial.

39.  Arapahoe County Court, specifically Judges Carlos Samour
     and Elizabeth Weishaupl were contacted by SVB counsel with the

intent of influencing the litigation in favor of SVB. It is
unknown as to what if any compensation was involved. "Samour"
did not preside over the trial, but did exercise influence
over Weishaupl, who did assist SVB in destroying property
owned by Rote.

40. Michelin was employed by SVB to operate and manage and help
sell the assets of Touchstar. Michelin gave false testimony at
the trial.

41. In violation of the agreement between Touchstar and NDT,
Michelin had ordered Touchstar personnel to install expiring
licenses on the software licensed by NDT from Touchstar, in
direct violation of the agreement. On numerous occasions
Michelin attempted to extort money from Rote and NDT.

42. Michelin allowed the licenses to expire on July 31, 2009.

43. NDT had secured un-expiring licenses, they believed from
Touchstar, and installed them.

44. On or around August 3rd 2009, Michelin determined that NDT
was still operating & acknowledged his intent to have shut NDT
down and destroy NDT's business.

45. In April 2009 NDT had filed a case in U.S. Federal District
Court of Oregon seeking emergency relief in removing the
expired licenses.

46. In June 2009 a Receiver was appointed to oversee the
liquidation of Touchstar's assets.

47. An emergency TRO hearing was held in early July 2009, when
and where Receivership counsel requested the case be
transferred to the U.S. District Court of Denver. Said case
was transferred to U.S. District Court of Denver Colorado on
or around July 23, 2009 with a stern recommendation from the
Portland Judge to Michelin and Touchstar to not shut NDT down.

48. While NDT was hiring counsel in Colorado, Michelin
contacted SVB and secured permission to shut NDT down and they
did so on August 6, 2009. SVB correspondence at the time
confirmed that the decision to shut NDT down was made "to
eliminate the current litigation by NDT against SVB". Michelin

was employed by SVB as a contractor. The shutdown was accomplished by Michelin, SVB and Touchstar employees by an unauthorized access to NDT's database server (not a Touchstar asset), from which assailant accessed other network servers and destroyed Touchstar software as well as other property. Unauthorized access by Touchstar was a violation of the **Computer Fraud & Abuse Act & a complaint was filed with the FBI. The FBI investigated the CFAA violation and made a recommendation to The U.S. Attorney's Office in Portland to prosecute SVB.**

49. On August 23, 2009 NDT prevailed in The U.S. District Court of Denver on an emergency TRO to force Touchstar to reinstall the software they had destroyed. Michelin refused to order Touchstar to perform. The legal fees incurred by NDT as of that time were in excess of $100,000.

50. On or around August 27, 2009 **SVB (in its sole capacity and without the participation of the Receiver) sought and secured a one week stay on the Federal Order, ex-parte, from Judge Carlos Samour.** Only the Receiver had the authority to pursue and secure that stay. Judge Samour was the Receivership Judge at that time.

51. By the time the stay was lifted SVB had sold the assets of Touchstar and did not perform on the Federal Order. **Samour was well aware that the stay would allow Touchstar to not perform on the Order.**

52. The party that acquired Touchstar's assets did reinstall the software in November 2009, and the software remained operational for outbound calling. Inbound calls were moved to a different platform.

53. Because Samour claimed exclusive judicial authority over the Touchstar estate, NDT moved the case to Samour's court. And at that time replaced counsel believing that Samour disdained the attorneys NDT used in the Denver Federal Court action. However, new counsel quickly concluded that there was strong bias in favor in SVB.

54.  As a result of that conclusion and because tort claims were asserted against Michelin, the Receiver and SVB, NDT requested a jury trial.

55.  SVB moved to strike the request for a jury trial and Samour ruled in SVB's favor, sanctioning NDT $11,000 in legal fees for the benefit of SVB.

56.  NDT requested that the fee payment be deferred until the end of the trial, noting that NDT had already prevailed in its interim action in Federal Court and at a cost of $100,000, which it would seek at trial.

57.  Samour dismissed NDT's claims until NDT paid the sanctions to SVB. Once paid by **Rote personally**, Samour reversed the dismissal.

58.  As a result of SVB's shutdown, NDT suffered a loss of profits close to $1.6 million and pursued those claims in Arapahoe County, as required by the Receivership Judge Carlos Samour. NDT affiliates suffered a much larger claim **but were not permitted by Judge Samour to join the lawsuit.**

59.  Judge Weishaupl replaced Judge Samour on this case one year before trial. Judge Weishaupl found in favor of NDT on pre-trial summary judgment motions.

60.  In March 2014 there was a week-long trial in Arapahoe County Colorado.

61.  On the first day of trial SVB counsel recommended that Judge Weishaupl contact Judge Samour on matters they claimed were decided by him in summary judgement, maintaining that she had reversed his earlier decisions. After the lunch break, Weishaupl became hostile towards NDT and Rote, limiting the evidence Rote was allowed to offer while expanding opportunities of evidence for SVB. Weishaupl has judicial immunity.

62.  Rote suffered a commensurate loss of value of the NDT and affiliate company stock, loss of loans to NDT, loss of compensation and loss of dividend income, through these acts

before the trial and beyond. SVB secured their advantage through fraud and Racketeering.

63.  Defending and prosecuting its claims against SVB ultimately destroyed Rote's affiliated group of companies.

64.  During the trial, Michelin, Grothe, Chris Rieple (of Telformance), Carl Saffell (of Livevox) provided false testimony that advanced the interests of SVB and the enterprise participants.

65.  At issue at trial was whether SVB and Touchstar had a right to shut down NDT in violation of a written agreement against it and whether Touchstar and SVB were in breach for failing to properly provision hardware to provision the necessary telephone lines to support the software.

66.  A significant part of that trial included testimony from Saffell, Rieple and Michelin on a portion of the contract between Touchstar and NDT regarding a provisioning mandate called the "line to agent ratio."

67.  The line to agent ratio is the number of telephone lines required to be provisioned on each server. The contract required a line to agent ration of 3 to 1 on each of the two servers provisioned, each server to be provisioned with 96 licenses and 288 telephone lines.

68.  Touchstar had provisioned 384 lines on server #1 and 192 telephone lines on server #2.

69.  Rieple testified that the contract language of "288 lines and 96 licenses" for server #1 and sever #2 was not a line to agent ratio of 3 to 1 and Touchstar was not required to provision them, nor was it a material part of the contract.

70.  Rieple did not admit that he was paid by SVB for his witness time at the time of trial, but was in fact compensated by SVB & has subsequently admitted that.

71.  Rieple worked for Telformance at the time of trial and still works for Telformance.

72.  Telformance's website specifically advertises its flexibility in delivering higher line to agent ratios and

takes a position that this is material to the platforms performance. Rieple previsously worked for Touchstar as a senior V.P., then worked at Livevox and then onto Telformance.

73.  Telformance is not registered as an entity doing business in Colorado. The Plaintiff believes Telformance received capital from SVB or its agent LiveVox on around the time of Rieple's testimony.

74.  Carl Saffell, like Rieple was a senior executive for Touchstar and testified on the same "line to agent ratio" portion of the contract.

75.  Saffell's testimony was the same as Rieple's that there was no "line to agent ratio" requirement in the contract and that provisioning them disproportionately did not violate the written terms of the contract. Saffell was paid for his testimony.

76.  Saffell works for Livevox and was coached and directed to provide false testimony by Te, Barber and his employer Livevox.

77.  Michelin's testimony was the same as Rieple's that there was no "line to agent ratio" requirement in the contract and that provisioning them disproportionately did not violate the written terms of the contract. Michelin was paid for his testimony.

78.  Golden Gate Capital is a Venture Partner with SVB and executed control over LiveVox, acquiring a majority of the stock just one week after the end of the trial in March 2014. Prior to that time Golden Gate was the largest shareholder but did not own more than 50% of the stock.

79.  LiveVox's website specifically advertises its flexibility in delivering higher "line to agent ratios" and takes a position that this is material to the platform's performance.

80.  The position taken by Rieple and Saffell is contrary to the public testimony of the companies they work for, which reference line to agent ratios as a material provision in the

contract and subsequently their testimony was false on its face.

81. Michelin testified as to the contract requirement of 288 telephone lines to a 96 agent ratio and his testimony was the same as Saffell and Rieple. Michelin was paid for his testimony. Michelin's testimony was intentionally false.

82. Delivery of disproportionate line to agent ratios was a material breach and NDT refused to pay for the balance owed until the breach was cured. It was never cured by Touchstar or SVB.

83. The Receiver was owned by Grothe and his spouse. Prior to the trial an investment was made in The Receivers by SVB counsel for the benefit of SVB. Barber's daughter and another family member work for The Receivers, Inc.

84. Grothe did not disclose the investment by SVB or its agents, the related parties to SVB counsel nor any investment by SVB or agents in Receiver.

85. Grothe testified that he ordered the shut down of NDT without reviewing the contract and based on a recommendation made by Michelin. And Michelin made the recommendation based on SVB's decision, which was designed to "shutdown NDT's ongoing litigation" per evidence acquired just before trial.

86. Grothe received compensation of more than $250,000.

87. Grothe while in possession of key discovery documents, provided very few documents claiming they had not been found, which included his correspondence between Michelin, SVB and Grothe on the shutdown. The discovery response and testimony was false.

88. Counsel for SVB was Barber and Trent and the law firm of which they are partners, which garnered more than $600,000 in legal fees on this matter.

89. Barber and Trent knew and did not disclose the investment SVB made to the parties influencing and exercising control over Grothe, Michelin, Rieple and Saffell, as well as the fees paid to witnesses.

90. Trent also tampered with a material witness of NDT threatening said witness with criminal prosecution. Trent made that threat ex-parte during a period of time when the witness was represented. SVB had long maintained that the licenses NDT secured were pirated. They directed the piracy statements as to Rote during the trial. The licenses were not pirated.

91. The licenses are specific to and registered to a server and provisioned with Touchstar software and were not pirated. The piracy claim was actively marketed against Rote and NDT and its affiliates with malicious intent.

92. Barber and Trent prepared and coached the SVB witnesses including Grothe, Rieple, Michelin, Saffell and SVB employees, did not disclose the witness compensation and facilitated the false testimony, thereby tampering with the witnesses.

93. Chester Te assisted in arranging for the compensation and tampering of witnesses, influencing LiveVox, Golden, The Receivers, Inc., Michelin, Grothe, Rieple and Saffell.

94. On July 31, 2014, the 5th anniversary date of the NDT shutdown, Judge Weishaupl issued an opinion in favor of SVB. The choosing of that date was by design.

95. The opinion vacated the written agreement in favor of one not requiring specified line to agent ratios concluding that the section was not material. Had Weishaupl not reached this conclusion, SVB would have materially breached the agreement first.

96. The opinion also reached conclusions of fact designed exclusively to protect Colorado counsel from criminal prosecution and malpractice claims.

97. The opinion also overturned the plain written meaning of section 2(c) of the contract (which was written to preclude SVB from shutting NDT down licenses already paid for). By reversing this section, the court endorsed the use of extortion techniques and reversed a decision made by the Federal Court on the same contract provision including the same parties.

98. Judge Weishaupl addressed many areas not called on by either party to the action, shoring up positions favorable to SVB & Colorado counsel.

99. Subsequent to Trial and just recently, Plaintiff has become aware Judge Carlos Samour influenced the litigation between NDT and SVB that resulted in the destruction of Rote's assets.

100. SVB counsel had a prior personal relationship with Samour which ultimately resulted in Judge Samour recusing himself from this case, but several years into the case.

101. Te, SVB & SVB counsel managed the parties and are complicit in these acts.

102. Key SVB employee Diane Lemay testified in deposition that Te ordered the shutdown. The email evidence suggests that SVB employee Diane Lemay ordered the shutdown. Nonetheless the email evidence was withheld from NDT for four years.

103. Key SVB employee Lemay testified in deposition that SVB did not recognize the $4 million loss from the sale of the assets for 2.5 years after the sale.

104. Rote filed a complaint with the SEC regarding the material understatement of the loss in SVB's 10Q and year end financial statements for 2009, 2010 and 2011. The sale originally represented a $2 million gain on the sale of the assets, which SVB and the parties did not disclose to the unsecured creditors. Alternatively there was no gain, but rather a sizeable loss, which was not recognized by SVB.

105. Concealing funds likely available to the unsecured creditors could only be done with Grothe's participation.

106. Grothe did not accurately report the gain on the sale or the loss derived on modifications to the sales agreement.

107. Rote acknowledges that losses sustained by Rote's company NDT have been adjudicated and are now closed, but was secured by a pattern of racketeering between the Defendants & discovered after the Judge's decision on July 31, 2014. The racketeering activity destroyed Rote's affiliated group of

corporations and it is the loss of that shareholder value Rote
is asserting as damages.

108. Subsequent to the litigation SVB and Te have continued to
support litigation against NDT brought by unrelated parties by
financing the legal fees of parties adverse to Rote and his
companies and particularly designed to stop Rote from writing
about the RICO abuses described in his blog and other
publications. The actions by the Defendants are that of an
Enterprise of parties engaged in Racketeering.

**PARTIAL LIST OF RICO PREDICATE ACTS
AND OTHER ACTS OF WITNESS RETALIATION**

109. Particular attention of this honorable Court is now drawn
to Exhibits A, B and C.

110. Exhibit A is the legislative history of the Computer Fraud
& Abuse Act.

111. Exhibit B is a partial list of Documented Retaliations
which Plaintiff had suffered *prior* to the date on which this
federal case was first filed.

112. Exhibit C is a subset of those Documented Retaliations
which also qualify as one or more of the RICO Predicate Acts
that are itemized at 18 U.S.C. §§ 1961(1)(B), (1)(D), and (5).

113. Moreover, further acts and events occurred after July 1,
2009, which also qualify as RICO predicate acts that
constitute *further* probable causes for all the relief
requested *infra*.

114. Plaintiff herein alleges that obstruction of justice did in
fact occur *when* Plaintiff was deprived of specific relief from
the district courts in Arapahoe Colorado and as a result of

false testimony sponsored, aided and abetted by SVB and its enterprise affiliates.

### COUNT ONE:
Acquisition and Maintenance of an Interest in and Control of an *Enterprise* Engaged in a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(b)

115. Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.    Substance prevails over form.

116. At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

117. During the ten (10) calendar years preceding March 15, 2016 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

118. Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to

threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

119. Pursuant to the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this honorable Court. Said construction rule was never codified in Title 18 of the United States Code, however. See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

120. *Respondeat superior* (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise).

**COUNT TWO:**
Conduct and Participation in a RICO *Enterprise*
through a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(c)

121. Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein. Substance prevails over form.

122. At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

123. Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering*

*activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

124. During the ten (10) calendar years preceding March 15, 2016 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

125. Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

126. Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court. Said construction rule was never codified in Title 18 of the United States Code, however. *Respondeat superior* (as explained above).

### COUNT THREE:
Conspiracy to Engage in a
*Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(d)

127. Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein. Substance prevails over form.

128. At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

129. At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did also conspire to conduct, participate in and or aided and abetted said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).

See also 18 U.S.C. §§ 1961(4), (5) and (9).

130. During the ten (10) calendar years preceding March 15, 2006 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

131. Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*).

132. Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court. Said construction rule was never codified in

Title 18 of the United States Code, however. *Respondeat superior* (as explained above).

### RELIEF REQUESTED

**Wherefore**, pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiff requests judgment against all named Defendants as follows:

### ON COUNT ONE:

1. That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2. That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO *enterprise* of *persons*, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.  That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT ONE *supra*.

4.  That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of *racketeering activity* in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.  That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.  That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

7.  That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.  That all Defendants pay to Plaintiff His costs of the
    lawsuit incurred herein including, but not limited to, all
    necessary research, all non-judicial enforcement and all
    reasonable counsel's fees, at a minimum of $400.00 per hour
    worked (standard professional rate at start of this
    action).

9.  That all damages caused by all Defendants, and all gains,
    profits, and advantages derived by all Defendants, from
    their several acts of racketeering in violation of 18
    U.S.C. 1962(b) and from all other violation(s) of
    applicable State and federal law(s), be deemed to be held
    in constructive trust, legally foreign with respect to the
    federal zone [sic], for the benefit of Plaintiff, His heirs
    and assigns.

10. That Plaintiff have such other and further relief as this
    Court deems just and proper, under the circumstances of
    this action.

## ON COUNT TWO:

1.  That this Court liberally construe the RICO laws and
    thereby find that all Defendants have associated with a
    RICO *enterprise* of *persons* and of other individuals who
    were associated in fact, all of whom did engage in, and
    whose activities did affect, interstate and foreign
    commerce in violation of the RICO law at 18 U.S.C. 1962(c)
    (Prohibited activities).

2.    That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) *supra*.

3.    That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from associating with any RICO *enterprise* of *persons*, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.    That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) *supra*.

5.    That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined

*temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT TWO *supra*.

6.    That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s).

7.    That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

8.    That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

9.    That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

10.   That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all

reasonable counsel's fees, at a minimum of $400.00 per hour
worked (standard professional rate at start of this
action).

11. That all damages caused by all Defendants, and all gains,
    profits, and advantages derived by all Defendants, from
    their several acts of racketeering in violation of 18
    U.S.C. 1962(c) *supra* and from all other violation(s) of
    applicable State and federal law(s), be deemed to be held
    in constructive trust, legally foreign with respect to the
    federal zone [*sic*], for the benefit of Plaintiff, His heirs
    and assigns.

12. That Plaintiff have such other and further relief as this
    Court deems just and proper, under the full range of
    relevant circumstances which have occasioned the instant
    action.

#### ON COUNT THREE:

1. That this Court liberally construe the RICO laws and
   thereby find that all Defendants have conspired to acquire
   and maintain an interest in, and/or conspired to acquire
   and maintain control of, a RICO *enterprise* engaged in a
   *pattern of racketeering activity* in violation of 18 U.S.C.
   §§ 1961(5), 1962(b) and (d) *supra*.

2. That this Court liberally construe the RICO laws and
   thereby find that all Defendants have conspired to conduct
   and participate in said RICO *enterprise* through a *pattern*

*of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra.*

3. That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO *enterprise* that engages in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d) *supra.*

4. That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra.*

5. That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT THREE *supra.*

6.  That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s).

7.  That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

8.  That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

9.  That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

10. That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, at a minimum of $400.00 per hour worked (standard professional rate at start of this action).

11.  That all damages caused by all Defendants, and all gains,
     profits, and advantages derived by all Defendants, from
     their several acts of racketeering in violation of 18
     U.S.C. 1962(d) *supra* and from all other violation(s) of
     applicable State and federal law(s), be deemed to be held
     in constructive trust, legally foreign with respect to the
     federal zone [*sic*], for the benefit of Plaintiff, His heirs
     and assigns.

12.  That Plaintiff has such other and further relief as this
     Court deems just and proper, under the full range of
     relevant circumstances which have occasioned the instant
     action.

## SUMMARY OF DAMAGES

Summary of Reasonable Counsel's Fees:        TBA

Summary of Consequential Damages:            TBA

Summary of Actual Damages (partial list):

    Debt loaned and guaranteed by Rote:  $    541,000.00

    triple damage multiplier (3x):       $  1,623,000.00

    Lost Salary & Dividends, actual:     $  1,200,000.00

    triple damage multiplier (3x):       $  3,600,000.00

    Value of Destroyed Business:         $  7,000,000.00

    triple damage multiplier (3x):       $ 21,000,000.00
                                                  --------------

      Subtotal:                        $ 26,223,000.00

Summary of Punitive Damages (3x):            $100,000,000.00

**TOTAL DAMAGES** (minimum):                 $126,223,000.00


    The  damage  matrix  is  three-dimensional:    for  each
Defendant, there are actual, consequential, and punitive damages
(3 columns) on each of three counts (3 rows).

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues triable to a jury lawfully convened.

## **LIST OF EXHIBITS**

Pursuant to 18 U.S.C. 1961(9), Plaintiff now formally incorporates His *documentary material* by reference to all of the following Exhibits, as if set forth fully here, to wit:

Exhibit "A" with Cover Sheets

Exhibit "B" with Cover Sheets

Exhibit "C" with Cover Sheets

**VERIFICATION**

I, Timothy C. Rote, *Pro Se*, Plaintiff in the above entitled action, hereby verify under penalty of perjury, under the laws of the United States of America, without the "United States" (federal government), that the above statement of facts and laws is true and correct, according to the best of my current information, knowledge, and belief, pursuant to 28 U.S.C. 1746(1). See the Supremacy Clause in the Constitution for the United States of America, as lawfully amended (hereinafter "U.S. Constitution").

Dated:      March 15, 2016

Signed:

Printed:    Timothy C. Rote

ROTE VS SILICON VALLEY BANK, ET AL.

COMPUTER FRAUD AND ABUSE ACT

EXHIBIT A

# 18 U.S. Code § 1030 - Fraud and related activity in connection with computers

Current through Pub. L. 114-38. (See Public Laws for the current Congress.)

- **US Code**
- **Notes**

  **(a)**Whoever—

  **(1)**

  having knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y. of section 11 of the Atomic Energy Act of 1954, with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it;

  **(2)**intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

  **(A)**

  information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) [1] of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

  **(B)**

  information from any department or agency of the United States; or

  **(C)**

  information from any protected computer;

  **(3)**

  intentionally, without authorization to access any nonpublic computer of a department or agency of the United States, accesses such a computer of that department or agency that is

1                                                    Exhibit A

exclusively for the use of the Government of the United States or, in the case of a computer not exclusively for such use, is used by or for the Government of the United States and such conduct affects that use by or for the Government of the United States;

**(4)**

knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

**(5)**

**(A)**

knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

**(B)**

intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

**(C)**

intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[2]

**(6)**knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if—

**(A)**

such trafficking affects interstate or foreign commerce; or

**(B)**

such computer is used by or for the Government of the United States; [3]

**(7)**with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any—

**(A)**

threat to cause damage to a protected computer;

**(B)**

threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or

**(C)**

demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;

shall be punished as provided in subsection (c) of this section.

**(b)**

2                                                                              Exhibit A

Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

**(c)**The punishment for an offense under subsection (a) or (b) of this section is—

**(1)**

**(A)**

a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(1) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

**(B)**

a fine under this title or imprisonment for not more than twenty years, or both, in the case of an offense under subsection (a)(1) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(2)**

**(A)**

except as provided in subparagraph (B), a fine under this title or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2), (a)(3), or (a)(6) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(B)**a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if—

**(i)**

the offense was committed for purposes of commercial advantage or private financial gain;

**(ii)**

the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

**(iii)**

the value of the information obtained exceeds $5,000; and

**(C)**

a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(2), (a)(3) or (a)(6) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(3)**

**(A)**

a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a)(7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

**(B)**

a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4),[4] or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(4)**

**(A)**except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of—

**(i)**an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)—

**(I)**

loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

**(II)**

the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

**(III)**

physical injury to any person;

**(IV)**

a threat to public health or safety;

**(V)**

damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

**(VI)**

damage affecting 10 or more protected computers during any 1-year period; or

**(ii)**

an attempt to commit an offense punishable under this subparagraph;

**(B)**except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 10 years, or both, in the case of—

**(i)**

an offense under subsection (a)(5)(A), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused) a harm provided in subclauses (I) through (VI) of subparagraph (A)(i); or

**(ii)**

an attempt to commit an offense punishable under this subparagraph;

**(C)**except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 20 years, or both, in the case of—

**(i)**

an offense or an attempt to commit an offense under subparagraphs (A) or (B) of subsection (a)(5) that occurs after a conviction for another offense under this section; or

**(ii)**

an attempt to commit an offense punishable under this subparagraph;

**(D)**a fine under this title, imprisonment for not more than 10 years, or both, in the case of—

**(i)**

an offense or an attempt to commit an offense under subsection (a)(5)(C) that occurs after a conviction for another offense under this section; or

**(ii)**

an attempt to commit an offense punishable under this subparagraph;

**(E)**

if the offender attempts to cause or knowingly or recklessly causes serious bodily injury from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for not more than 20 years, or both;

**(F)**

if the offender attempts to cause or knowingly or recklessly causes death from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for any term of years or for life, or both; or

**(G)**a fine under this title, imprisonment for not more than 1 year, or both, for—

**(i)**

any other offense under subsection (a)(5); or

**(ii)**

an attempt to commit an offense punishable under this subparagraph.

**(d)**

**(1)**

The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

**(2)**

The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title.

**(3)**

Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.

**(e)**As used in this section—

**(1)**

5                                                                    Exhibit A

the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

**(2)**the term "protected computer" means a computer—

**(A)**

exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government; or

**(B)**

which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;

**(3)**

the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession or territory of the United States;

**(4)**the term "financial institution" means—

**(A)**

an institution, with deposits insured by the Federal Deposit Insurance Corporation;

**(B)**

the Federal Reserve or a member of the Federal Reserve including any Federal Reserve Bank;

**(C)**

a credit union with accounts insured by the National Credit Union Administration;

**(D)**

a member of the Federal home loan bank system and any home loan bank;

**(E)**

any institution of the Farm Credit System under the Farm Credit Act of 1971;

**(F)**

a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934;

**(G)**

the Securities Investor Protection Corporation;

**(H)**

a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); and

**(I)**

an organization operating under section 25 or section 25(a)

1

of the Federal Reserve Act;

**(5)**

the term "financial record" means information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution;

**(6)**

the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

**(7)**

the term "department of the United States" means the legislative or judicial branch of the Government or one of the executive departments enumerated in section 101 of title 5;

**(8)**

the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

**(9)**

the term "government entity" includes the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province, municipality, or other political subdivision of a foreign country;

**(10)**

the term "conviction" shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

**(11)**

the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and

**(12)**

the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity.

**(f)**

This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

**(g)**

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [5] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in

7                                   Exhibit A

subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

**(h)**

The Attorney General and the Secretary of the Treasury shall report to the Congress annually, during the first 3 years following the date of the enactment of this subsection, concerning investigations and prosecutions under subsection (a)(5).

**(i)**

**(1)**The court, in imposing sentence on any person convicted of a violation of this section, or convicted of conspiracy to violate this section, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person forfeit to the United States—

**(A)**

such person's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation; and

**(B)**

any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

**(2)**

The criminal forfeiture of property under this subsection, any seizure and disposition thereof, and any judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except subsection (d) of that section.

**(j)**For purposes of subsection (i), the following shall be subject to forfeiture to the United States and no property right shall exist in them:

**(1)**

Any personal property used or intended to be used to commit or to facilitate the commission of any violation of this section, or a conspiracy to violate this section.

**(2)**

Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this section, or a conspiracy to violate this section [6]

(Added Pub. L. 98–473, title II, § 2102(a), Oct. 12, 1984, 98 Stat. 2190; amended Pub. L. 99–474, § 2, Oct. 16, 1986, 100 Stat. 1213; Pub. L. 100–690, title VII, § 7065, Nov. 18, 1988, 102 Stat. 4404; Pub. L. 101–73, title IX, § 962(a)(5), Aug. 9, 1989, 103 Stat. 502; Pub. L. 101–647, title XII, § 1205(e), title XXV, § 2597(j), title XXXV, § 3533, Nov. 29, 1990, 104 Stat. 4831, 4910, 4925; Pub. L. 103–322, title XXIX, § 290001(b)–(f), Sept. 13, 1994, 108 Stat. 2097–2099; Pub. L. 104–294, title II, § 201, title VI, § 604(b)(36), Oct. 11, 1996, 110 Stat. 3491, 3508; Pub. L. 107–56, title V, § 506(a), title VIII, § 814(a)–(e), Oct. 26, 2001,115 Stat. 366, 382–384; Pub. L. 107–273, div. B, title IV, §§ 4002(b)(1), (12),

4005(a)(3), (d)(3), Nov. 2, 2002, <u>116 Stat. 1807</u>, 1808, 1812, 1813; <u>Pub. L. 107–296, title II, § 225(g)</u>, Nov. 25, 2002, <u>116 Stat. 2158</u>; <u>Pub. L. 110–326, title II</u>, §§ 203, 204(a), 205–208, Sept. 26, 2008, <u>122 Stat. 3561</u>, 3563.)

Exhibit A

# ROTE VS SILICON VALLEY BANK, ET AL.

## LIST OF PREDICATE ACTS

### EXHIBIT C

1. FRAUD IN THE INDUCEMENT OF CONTRACT . PRE SVB.
2. BREACH OF CONTRACT. CONSPIRACY TO COMMIT FRAUD BY REMOVING SOFTWARE SOLD TO ROTE'S COMPANY WHILE KEEPING THE $200,000 PAID BY NDT.BY SVB, MICHELIN.
3. EXTORTION EVENTS ONE THROUGH FIVE. PRE SVB. MICHELIN.
4. EXTORTION EVENTS SIX THROUGH EIGHT, TEMPORARY SHUTDOWNS IN VIOLATION OF CONTRACT. BY SVB, MICHELIN.
5. FRAUDULENT FINANCIAL STATEMENTS OF TOUCHSTAR. BY SVB, MICHELIN, RECEIVER.
6. UNAUTHORIZED ACCESS TO COMPUTER AND DESTRUCTION OF PROPERTY. VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT. BY SVB, MICHELIN, RECEIVER, & GROTHE
7. REFUSAL TO PERFORM ON A FEDERAL ORDER & BY THAT INCREASING DAMAGE TO ROTE. BY SVB, SVB COUNSEL, MICHELIN, RECEIVER.
8. EX PARTE CONTACT WITH SAMOUR, ORDER OF STAY WITHOUT RECEIVER. BY SVB, SVB COUNSEL, RECEIVER.
9. INTERFERENCE WITH CONTRACT, COLLUSION AND CONSPIRACY. SVB.
10. CONCEALING ASSETS AVAILABLE FOR THE UNSECURED CREDITORS. BY SVB, RECEIVER, GROTHE.
11. FAILING TO DISCLOSE LOSSES ON FINANCIAL STATEMENTS FILED WITH THE SEC. SVB.
12. FALSE REPORTS BY RECEIVER FOR THE BENEFIT OF SVB. GROTHER, RECEIVER, SVB, SVB COUNSEL.
13. CONSPIRACY TO DEFRAUD VENDOR NDT AND UNSECURED CREDITORS. THE RECEIVER. BY SVB COUNSEL, GROTHE.
14. WITHHOLDING CRITICAL DISCOVERY. BY SVB.
15. FAILURE TO DISCLOSE COUNSEL REALTIONSHIP WITH CARLOS SAMOUR AND EXERCISING INFLUENCE OVER THE COURT. BY SVB COUNSEL, SVB.
16. COACHING AND INFLUENCING WITNESSES TESTIMONY. BY SVB, COUNSEL, LIVEVOX, GOLDEN, TELFORMANCE.
17. TAMPERING WITH NDT WITNESSES. SVB COUNSEL, SVB.
18. FALSE TESTIMONY. SVB COUNSEL, SVB, MICHELIN, RIEPLE, SAFFELL, GROTHE, LIVEVOX, TELFORMANCE, GOLDEN.
19. TARGETING ROTE AFTER THE LITIGATION TO STOP THE PUBLIC DISSEMINATION OF TRIAL TESTIMONY, WITNESS TAMPERING & IN RETALIATION FOR CRIMINAL COMPLAINTS. SVB.

# ROTE VS SILICON VALLEY BANK, ET AL.

## PARTIAL LIST OF DOCUMENTED RETALIATION

### EXHIBIT B

1. EXTORTION DEMAND AND SHUTDOWN EVENTS SIX THROUGH EIGHT. BY SVB, MICHELIN.
2. UNAUTHORIZED ACCESS TO COMPUTER AND DESTRUCTION OF PROPERTY. CFAA BY SVB, MICHELIN.
3. DEFAMATORY STATEMENTS ALLEGING SOFTWARE PIRACY. SVB, MICHELIN, RECEIVER.
4. REFUSAL TO PERFORM ON A FEDERAL ORDER AND EXTENDING SHUTDOWN. BY SVB, SVB COUNSEL, MICHELIN, RECEIVER.
5. INTERFERENCE WITH CONTRACT , CONSPIRACY& COLLUSION. SVB, LEAPFROG.
6. ABUSE OF LITIGATION PROCESS INTENDED TO DESTROY PLAINTIFF. SVB.
7. WITHHOLDING CRITICAL DISCOVERY. BY SVB, GROTHE, RECEIVER.
8. FAILURE TO DISCLOSE PAST SVB COUNSEL REALTIONSHIP WITH CARLOS SAMOUR. BY SVB COUNSEL, SVB, GROTHE.
9. AIDING AND ABETTING FALSE TESTIMONY. BY SVB, COUNSEL, LIVEVOX, GOLDEN, TELFORMANCE.
10. COLLUSION WITH RECEIVER ON ASSETS OF THE ESTATE. SVB, RECEVIER, GROTHE.
11. EXCESSIVE PAYMENTS TO WITNESSES. SVB, SVB COUNSEL, LIVEVOX.
12. TAMPERING WITH NDT WITNESSES. SVB COUNSEL, SVB.
13. FALSE TESTIMONY. SVB COUNSEL, SVB, MICHELIN, RIEPLE, SAFFELL, GROTHE, LIVEVOX, TELFORMANCE, GOLDEN.